

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00054-CV

IN THE INTEREST OF T.D.-B., A CHILD

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2023-1964-CCL2

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens
Concurring Opinion by Justice van Cleef
Dissenting Opinion by Justice Rambin

# MEMORANDUM OPINION

The Department of Family and Protective Services filed a petition to terminate Father's parental rights to his daughter, Talia.[1] Following a bench trial, the trial court terminated Father's parental rights after finding that (1) he "knowingly placed or . . . allowed the child to remain in conditions or surroundings [that] endanger[ed her] physical or emotional well-being," (2) he "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endanger[ed her] physical or emotional well-being," (3) he failed to comply with provisions of a court order establishing the actions needed to obtain Talia's return, (4) he "used a controlled substance . . . in a manner that endangered" the child and he "failed to complete a court-ordered substance abuse treatment program," (5) he posed a continuing danger to the child despite the Department's reasonable efforts to return her, and (6) termination of his parental rights was in the child's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O)(i), (P), (b)(2), (f) (Supp.).[2]

On appeal, Father argues that the evidence is insufficient to support the trial court's finding that the Department could not return Talia to Father despite its reasonable efforts due to continuing danger or to support the trial court's best-interest finding. Because we find that legally and factually sufficient evidence supports the trial court's termination of Father's parental rights, we affirm the trial court's judgment.

---

[1]We use pseudonyms to protect the identity of the child. *See* TEX. R. APP. P. 9.8.

[2]Mother's parental rights to Talia were also terminated after she filed an affidavit of relinquishment of her parental rights. Mother does not appeal.

## I.  Sufficient Evidence Supports Grounds for Termination of Parental Rights

In his first point of error, Father argues that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds existed to support the termination of his parental rights.

### A.  Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).  "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)).  "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'"  *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500).  "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007), *pet. denied*, 260 S.W.3d 463 (Tex. 2008) (per curiam) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)).  "'Clear and convincing evidence' is that 'degree of

proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002))). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could

not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *Id.* (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness's demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

### B.    The Evidence at Trial

Jessica Galindo, an investigator with Child Protective Services, testified that, on October 22, 2023, the Department received an intake stating that Talia was "born at 33 weeks with the mother testing positive for amphetamines." Because of her premature birth, which Galindo opined was from Mother's methamphetamine use, Talia was sent to the Neonatal Intensive Care

5

Unit (NICU) in Houston. Galindo testified that Talia had low birth weight, had breathing problems, and could not feed from a bottle. Because of those problems, Talia remained in the NICU for a few months.

Michael Shane Morris, a toxicologist employed by Quest Diagnostics, testified that Mother tested positive for amphetamine and methamphetamine on a consistent basis after Talia's removal. Morris testified that Father tested positive for methamphetamine and marihuana metabolite on November 9, 2023, and tested positive for marihuana metabolite on December 28, 2023, and January 11, February 8, February 22, March 7, and March 28, 2024. Father also failed to appear for a November 21, 2024, drug test, which was presumed positive. According to Theresa Robinson, a permanency specialist with 4Kids4Families, Father had no negative drug test results during the pendency of the case.

Father testified that he first used methamphetamine when he was eighteen and had been using the drug "[o]ff and on for 10 years." Father admitted that he and Mother both used methamphetamine together when they "first found out [Mother] was pregnant" and that he was using the drug every day around the time that Talia was born. Father testified that he and Mother were homeless when Talia was born prematurely. Father also admitted that he was jailed during the pendency of the case for a drug-related charge and used marihuana metabolite after his release from jail.

Even so, Father did not believe that it was in Talia's best interest to terminate his parent-child relationship. Father testified that he was living with his adoptive mother and his brother's family and wished for Talia to move in with them. Yet, 4Kids4Families had been trying to

6

complete the required home study of the adoptive mother and brother's home for months, without any success. Father testified that he knew he was required to move out of the home to begin the home study but never did so. Father acknowledged that he had eliminated the possibility of placing Talia with his family by refusing to move out. While he planned to renovate a camper trailer that had a hole in the floor, he admitted he did not have a place to move it to.

Father had the right to supervised visitation once a week but had never progressed to obtaining additional visitation rights because of his positive drug tests. Father claimed he had been methamphetamine-free for "[a]bout a month and a half" but admitted he was still using "CBD, Delta-8," which he legally purchased to help with his anxiety. When asked if marihuana was illegal in Texas, Father responded, "To be honest, I'm not sure," even though he was previously jailed for possession of a marihuana vape pen.

Robinson testified that Father completed parenting classes, a drug and alcohol assessment, a psychological evaluation, and individual counseling but did not successfully complete substance abuse counseling or a treatment program. Robinson testified that Father was provided with supervised visitation when he was not incarcerated but "would be consistently late" until the months before trial. Robinson testified that Father brought a person to one of the visits who had a "consistent, strong smell of marijuana" on his person. According to Robinson, it was not in Talia's best interest to be returned to Father because he posed a significant threat to her physical and emotional health.

Angie Higueros, a Court Appointed Special Advocate (CASA) supervisor, testified that Talia's foster placement was safe and that her foster mother was taking care of the child's needs. Higueros testified that CASA was concerned about Father's ability to provide a home for Talia and believed that terminating Father's parental rights was in Talia's best interest.

Colton Newberg, Father's adoptive brother, did not wish to see Father's parental rights terminated. Even so, Newberg testified that it was not in Talia's best interest to be returned to Father in his then-current state and testified that he and his wife wished to adopt Talia.

After hearing this evidence, the trial court terminated Father's parental rights to Talia.

### C. Sufficient Evidence Supports the Ground D and E Findings

"Generally, '[o]nly one predicate ground and a best interest finding are necessary for termination, so "a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."'" *In re C.C.*, 720 S.W.3d 31, 57 (Tex. App.—Texarkana 2025, no pet.) (alteration in original) (quoting *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) (quoting *In re N.G.*, 577 S.W.3d 230, 233 (Tex. 2019) (per curiam))). Even so, "due process requires that courts also review termination under Subsections 161.001(b)(1)(D) and (E) even after affirming termination on another ground because of the collateral effects of termination on those grounds." *In re M.P.*, 639 S.W.3d at 702.

Ground D permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of

8

the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Ground E permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d at 803. "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Boyd*, 727 S.W.2d at 533); *see In re L.E.S.*, 471 S.W.3d at 923. Because the term "'endanger' . . . include[s] a substantial risk of harm to the child," direct harm to the child is not required. *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *see In re N.L.S.*, 715 S.W.3d 760, 764 (Tex. 2025) (per curiam). Accordingly, "[i]t is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923.

When evaluating Ground D, "we are to examine the time prior to [the child's] removal to determine whether the environment of the home posed a danger to [her] physical or emotional well-being." *In re D.R.*, 631 S.W.3d 826, 833 (Tex. App.—Texarkana 2021, no pet.) (quoting *In re L.E.S.*, 471 S.W.3d at 926). "Ground (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *Id.* (alterations in original) (quoting *In re L.C.*, 145 S.W.3d 790, 797 (Tex. App.—Texarkana 2004, no pet.)). "[U]nlawful conduct by a parent . . . can create an environment that endangers the physical and emotional well-being of a child as required for termination under [Ground] (D)." *Id.* at 834 (alterations in original) (quoting *In re*

9

*C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.)).

Under Ground "(E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *In re L.E.S.*, 471 S.W.3d at 923 (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under [Ground] (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.); *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67)).

"Ground E 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *In re R.G.*, No. 06-24-00035-CV, 2024 WL 4142842, at *5 (Tex. App.—Texarkana Sept. 11, 2024, no pet.) (mem. op.) (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The endangering conduct may also occur 'either before or after the child's removal by the Department.'" *Id.* (quoting *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied))). In our analysis under Ground E, we may also consider a parent's failure to complete relevant requirements of a family service plan. *In re Z.J.*, 2019 WL 6205252, at *11; *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.).

The evidence at trial showed Father used methamphetamine with Mother while being fully aware that she was pregnant, creating a danger for premature birth. "[I]llegal drug use by a parent . . . supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *In re D.R.*, 631 S.W.3d at 834 (alteration in original) (quoting *In re K.B.*, No. 06-20-00074-CV, 2020 WL 7702179, at *4 (Tex. App.—Texarkana Dec. 29, 2020, no pet.) (mem. op.)). Here, the record shows that Talia was born prematurely and suffered the consequences of Mother's and Father's drug use in the form of low birthweight, trouble breathing, and trouble eating. As a result, the evidence was both legally and factually sufficient to show, by clear and convincing evidence, that Father's drug use around Mother, and his acceptance of Mother's drug use while she was pregnant, created conditions or surroundings that endangered Talia's physical well-being.

Father readily admitted his long history of drug abuse. "'Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under' Ground E." *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker*, 312 S.W.3d at 617)). Father's "failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under [Ground] (E) . . . ." *Id.* (quoting *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (per curiam) (mem. op.) (citing *Vasquez v. Tex. Dep't of*

*Protective & Regul. Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied))).

Here, the evidence shows that Father tested positive for methamphetamine after Talia's removal, had a presumptive positive test as late as November 2024, and consistently tested positive for marihuana metabolite throughout the pendency of the case. Even so, he did not complete any substance abuse counseling or treatment program. Additionally, Father had been jailed during the case, resulting in missed visitations. The record also shows that Father and Mother were homeless while Mother was pregnant and that Father still had no stable home of his own. Based on that evidence, a rational factfinder "could reasonably infer Father's difficulties in providing shelter and support for" Talia "were related to his drug use." *In re R.R.A.*, 687 S.W.3d at 279. As a result, legally and factually sufficient evidence showed that Father engaged in a course of conduct that endangered Talia's physical and emotional well-being.

**D.      Continuing Danger Remained Despite the Department's Efforts to Return the Child**

While arguing the sufficiency of the evidence on Grounds D and E, Father raised a complaint related to Section 161.001(f), which states, in relevant part, that

> the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
>> (1)      the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent.

TEX. FAM. CODE ANN. § 161.001(f)(1).

12

Here, the Department made reasonable efforts to return Talia to Father by implementing a family service plan and by attempting to complete a home study. *See In re M.N.M.*, 708 S.W.3d 321, 329 (Tex. App.—Eastland 2025, pets. denied) ("The Department's implementation of a family service plan is generally considered a reasonable effort to return the child to the parent." (citing *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.))).

Father failed to abide by the terms of the family service plan and admitted the home study could not be initiated since Father was present in the home. As for the issue of continuing danger, Father admitted to a long history of methamphetamine use. Although he claimed to be methamphetamine-free for "[a]bout a month and a half," Father's claim was never substantiated since he was presumed positive for the drug on November 21, 2024, and Robinson testified that Father had no negative drug test during the pendency of the case. *See In re R.R.A.*, 687 S.W.3d at 281 (noting that the Department's family service plan "deemed a failure to test as a positive test."). Moreover, it was undisputed that Father tested positive for marihuana throughout the pendency of the case and was jailed for drug possession, which prevented him from visiting Talia. From this evidence, the trial court could have formed a firm belief or conviction that Father posed a continuing danger to Talia. As a result, we find no error in the trial court's Section 161.001(f) finding.

Because we find that legally and factually sufficient evidence supported the trial court's Ground D and E findings, and that the trial court did not err by finding that there was a

13

continuing danger to Talia despite the Department's reasonable efforts to return her, we overrule Father's first point of error.

## II.     Sufficient Evidence Supports the Trial Court's Best-Interest Finding

Next, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in Talia's best interest.

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re R.G.*, 2024 WL 4142842, at \*6 (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam))). "Termination "'can never be justified without the most solid and substantial reasons.'"" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of a child, courts consider the following *Holley*[3] factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 819 (citing *Holley*, 544 S.W.2d at 372); *see In re E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b).

---

[3]*See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

14

The Department is not required to present proof of each *Holley* factor. *See In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27). "When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *Id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). We may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

As for the first factor, Talia, who was less than one and one-half years old, was too young to express her desires. Even so, Robinson testified that the child was "always happy to see Dad" and that she was bonded with both Father and her foster family. Father's testimony shows that he loved Talia and wished to be with her. Due to the fundamental interests implicated in terminating a parent-child relationship, we find that there was sufficient evidence to support a finding that the first *Holley* factor weighed in Father's favor.

Next, the emotional and physical needs of Talia were great given her young age. Robinson testified that Talia had to attend "physical therapy due to being born premature and [was] behind in her development." She also testified that Talia got "sick pretty regularly due to her immune system not being as strong." Father was unemployed for the majority of the case and did not show that he had the ability to pay for the specialized treatment Talia needed. We

15

find that there was sufficient evidence to support a finding that the second *Holley* factor weighed against Father.

As for the third factor, the evidence at trial shows that Father endangered Talia by using methamphetamine with Mother while she was pregnant, was jailed during the pendency of the case for possessing a marihuana vape pen, and had no negative drug tests. Galindo testified that drug use creates an altered mind state making it difficult for a parent to meet a child's basic needs for food, shelter, and clothing. Robinson agreed with Galindo's assessment and testified that drug use could "inhibit employment." Father was unemployed and homeless during Mother's pregnancy and still had no home of his own. Because he was incarcerated, he lacked employment for the majority of the case's pendency. Although Father testified that he had been employed as a landscaper for "[a] couple of weeks" by the time of trial, he lacked stability and a home of his own. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (quoting *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.)). Because Father's history suggested that he was incapable of providing for his own needs as well as Talia's, we find that there was sufficient evidence to support a finding that the third *Holley* factor weighed in favor of terminating Father's parental rights.

Next, the record shows that Father only had weekly supervised visitation with Talia and had never progressed to receiving unsupervised visits because he could not pass a drug test. Although he had taken parenting classes, the record shows that Father's acts, including bringing a person who smelled strongly of marihuana to a visitation and being late to visitation,

16

demonstrated a lack of parental ability. Accordingly, we find that there was sufficient evidence to support a finding that the fourth *Holley* factor weighed in favor of terminating Father's parental rights.

As for the programs available to assist Father, the record shows that Father failed to comply with the terms of the family service plan because he did not attend substance abuse counseling or treatment. Instead, he continued to test positive for drugs. In light of Father's failure to comply, we find that there was sufficient evidence to support a finding that the fifth *Holley* factor weighed against him.

As for the sixth factor, Robinson testified that Talia's placement was not permanent even though Talia was bonded to her placement. Even so, Robinson testified that another respite care placement indicated her interest in being a "forever home" for Talia if she were legally available for adoption. Thus, the Department's plan was for the Department to be named Talia's managing conservator. In contrast, Father's plan was for Talia to be placed in his adoptive mother and brother's home, but he admitted that no home study could be completed because he was still living in the home and had no place else to move. Because Father did not yet have a plan to provide Talia with a stable home, we find that there was sufficient evidence to support a finding that the sixth *Holley* factor weighed against Father.

As for the remaining factors, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d

17

436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."))). Father's use of methamphetamine with Mother while she was pregnant showed that the existing parent-child relationship was not appropriate. The record shows that Father, who was homeless and jailed during the pendency of the case, was unstable due to a lengthy history of drug use. Despite knowing that he had to submit negative drug tests to obtain Talia's return, Father was unable to do so. He also missed a drug test in November 2024, resulting in a presumptive positive test. Father's excuse for the drug tests that were positive for marihuana metabolite was that he purchased legal CBD and Delta 8 products, but he had no excuse for his presumptive positive drug test or his continued positive drug tests for marihuana metabolite after being warned that they would inhibit his ability to procure unsupervised visitation. That evidence was sufficient to support a finding that the last three *Holley* factors weighed in favor of terminating Father's parental rights.

After considering whether the evidence was sufficient to support the trial court's implicit *Holley* findings, we conclude that legally and factually sufficient evidence supports the trial court's best-interest finding against Father. As a result, we overrule Father's last point of error.

III.     **Conclusion**

We affirm the trial court's order.


Scott E. Stevens
Chief Justice


18

CONCURRING OPINION

I respectfully concur.

The opinion of the Chief Justice reaches the correct result, in my view, based on Father's failure to test for drugs, which results in a presumptively positive test. Thus, while the case was pending and while his admitted methamphetamine use and possible marihuana use were impediments to Father's possessory right, Father was presumed to still be using those drugs. This is unfortunate, since Father seemed to make substantial progress toward ending those habits.

However, I would not fault Father's failure to leave the home where he lived in order to accommodate unknown Department policies regarding home visits. The Department seemingly determined, prior to the final disposition of this matter, that Father's home would not be studied and that Father's home was not with fictive kin. Father did, in fact, have a home with fictive kin and also desired the return of his child to him; placement with fictive kin was an alternative suggestion. This set an odd circumstance where the same physical location would need to be studied both with and without Father. This circumstance did not excuse the Department from providing the trial court with at least one home study (Father's home with fictive kin). And the record does not disclose any specific reason why the Department could not prepare *both* home studies. Presumably, the fictive kin home study would stipulate Father moving elsewhere just as any home study might recommend changes to facilitate placement. Courts have excused the lack of a home study in odd circumstances, but those circumstances were based, for example, on travel distance to another State, incarceration, and other factors not present here. The lack of a

19

home study by the Department is no more excused, here, than Father's failure to undergo required drug testing.

Even so, based on the precedent this Court must observe, Father's presumptively positive drug test during the pendency of the case provides justification for affirming the trial court's decision.

I therefore concur with the main decision.

Charles van Cleef
Justice

DISSENTING OPINION

Let me begin with two questions posed by the attorney for the Department. These questions were put to Father and to the man trying to help Father and this child:

"*Why didn't you go ahead and live in your truck?*"

"*[W]hen you found out him living there was a problem getting a home study done, why didn't the family kick him to the curb that day?*"

(Emphasis added).

Father repeatedly testified that he wanted his daughter.[4] Father was bonded with his daughter: "She was always happy to see Dad. Typically wanted to get out of her car seat right

---

[4]Father's testimony regarding placement in the event his rights were terminated was in the alternative. His testimony on these points was as follows:

> Q. (BY THE STATE:) Okay. And it is my understanding that *if the child is not returned to you today* that you want this family to be considered as a placement for your daughter; is that correct?

20

after we got there."  The same is true for Father's fictive kin family.  The Department's witness, Robinson, testified, "[She] appears to be bonded with all of them and has a very secure bond."  For all of his faults, Father had improved between the time of removal and the final hearing.  He was trying.  This is not to condone his ongoing marihuana use, nor his sporadic work history.

But while he was not providing a steady paycheck and he was not paying a mortgage, this Father offered a home for his daughter.  In significant part, he readied this home for his daughter

---

A.    Yes, sir.
....
Q.    . . . Do you think it is in the -- are you telling this Judge it is in the best interest of your child to send you home with your child today, no strings attached?
A.    Yes, sir.
....
Q.    So let me ask you again:  Is it in the best interest of your daughter for her to go home with you today no strings attached?
A.    Yes, sir.
....
Q.    (BY FATHER'S COUNSEL:)  You don't want your rights terminated, do you?
A.    No, ma'am.
....
Q.    And as her dad -- this goes without saying, but we are going to say it anyway -- you don't believe that it would be in her best interest for your rights to be terminated; right?
A.    No.
Q.    You have developed a relationship with her at your visits?
A.    Yes, ma'am.
Q.    You're bonded to her?
A.    Yes.
Q.    She's bonded to you?
A.    Yes, ma'am.
Q.    *You've heard it testified that she gets excited when she sees you*
A.    *Yes, ma'am.*
....
Q.    -- at the visits; right?
A.    Yes, ma'am.
Q.    You would like for that to continue, wouldn't you?
A.    Yes, ma'am.
Q.    *You want a full-time relationship with her; correct?*
A.    *Correct.*

(Emphasis added).

21

with his own hands.[5]  It is a good home.  So good that the Department was considering it as the child's forever home, so long as Father's rights to his daughter, and vice-versa, were forever severed.  In my estimation, the Department's refusal to conduct a home study with Father in it resulted from a profound error of law by the Department.

Questions of law are reviewed de novo.  *In re R.R.A.*, 687 S.W.3d at 276 ("We review de novo the court of appeals' interpretation of 'endanger' in Family Code section 161.001.").

The error here being that the Department believes the law entitles it to tell a father fighting for his daughter to go live in a truck and to tell a man offering shelter and support to the father to turn the father away.  I do not see the basis for that.  The Department has conducted home studies before when assessing a parent's ability to parent.  *See In re J.W.*, 645 S.W.3d 726, 734 (Tex. 2022) ("Father proposed that he and J.W. could move in with Mother's sister . . . and requested that the Department conduct a home study.").  In that case, the Department conducted the home study of the sort they refused to conduct here.  *See id.* at 747.  The home study revealed concerns that supported a ground O finding.  *Id.* ("With respect to Mother's sister, the Department's home study raised concerns about her ability to meet a child's needs, and a caseworker testified that she too withdrew her name from consideration as a placement.").  Here, ground O is not at issue, because the Department's brief on appeal does not defend this

---

[5]For example:

> Q.    (BY FATHER'S COUNSEL:)  Tell the judge some of the things that you and [fictive kin brother] have done to get the house ready?
> A.    We redid the ceiling.  We redid the light fixtures.  We did the painting.  We redid the kitchen.  We're still working on one part that's a -- and that's just getting the fire extinguisher, which comes in tomorrow online from where we got it from.

termination on ground O.[6]  Dissenting justices in *In re J.W.* pointed out someone withdrawing their name from being named a custodian of a child is not the same as a withdrawal of an offer of shelter and support to the parent and the child.  *Id.* at 764.  (Blacklock, J., dissenting, joined by Busby and Devine, JJ.).  Here, though, there is no disagreement; the fictive brother, Father's friend of fifteen years, was all-in for both Father and this child, but the Department told him he had to pick.  Justice Young, in his concurring opinion in *In re J.W.* observed, "But the stakes here—the future of small children and of families—are dramatically higher than in most administrative cases, and the courts must subject the State's contentions to genuine scrutiny rather than the scrutiny of the rubber stamp."  *Id.* at 755 (Young, J., concurring).  The majority held,

> We certainly do not condone or make light of the potential, highlighted by Father, for the Department to summarily dismiss all kinship placement options in a "quest to punish a parent" rather than serve the best interest of the child.  Such behavior threatens to unjustifiably invade a parent's due process rights and would violate both federal and state law.

*Id.* at 748.  Point being that *In re J.W.* was decided very nearly three years before the final hearing in this case, which is plenty of time for the Department to acquaint itself with the decision and pass along its lessons to field personnel.  But in this case, the Department refused to

---

[6]That said, my judicial antennae are raised and attuned to the Department purportedly abandoning ground O but in actuality proceeding with the wolf of O in the sheep's clothing of grounds D and E.  *See In re A.A.*, 670 S.W.3d 520, 531 (Tex. 2023) ("At trial, DFPS typically demonstrates a parent's failure to comply with the service plan through the testimony of the parent's caseworker.  In some cases, that could be a more straightforward path to a termination judgment for DFPS than putting on witnesses to make a case of endangerment would be.  The more straightforward path is not always the right one, and our judicial antennae are raised and attuned to potential misuses of (O).").

conduct the sort of home study that was actually done in *In re J.W.*, and having refused to do a home study, proceeded to pose the questions quoted at the outset, and more.[7]

Beyond *In re J.W.*, there is another reason to believe the Department has a mistaken view of the Department's burden. A relatively new statute that the courts have yet to address, Section 161.001(f), requires that the Department prove not only the existence of grounds for termination, but also that a "continuing danger" exists at the time the termination order is entered. TEX. FAM. CODE ANN. § 161.001(f)(1). Other statutes factor into my assessment of whether there was a continuing danger. For example, since September 1, 2021, the law has been that

> [t]he Department of Family and Protective Services may not take possession of a child under this subchapter based on evidence that the parent: . . (8) tested

---

[7]Having denied the home study (and anything beyond supervised visitation in public places) the Department nonetheless proceeded to repeatedly ask Father questions the Department already knew the answer to. Father repeatedly answered those questions directly and concisely. This exchange is illustrative:

> Q.    All right. Have you had the opportunity -- because kids get sick. Have you had the opportunity to take care of this child when she was sick in the middle of the night?
> A.    No.
> Q.    Have you had the opportunity to figure out how you are going to get her to the doctor when you've got to be at work in 20 minutes?
> A.    To be honest, I'd just call in.
> Q.    But, I mean, have you actually had to do that with her?
> A.    Right.
> Q.    The answer is no, you haven't had the chance to --
> A.    No. I haven't had the chance, no.
> Q.    You haven't had the chance to demonstrate that you can handle it if she got sick at 3:00 in the morning or if she needed to go to the doctor and you needed to be at work in 15 minutes; correct?
> A.    Correct.
> Q.    All right. You haven't had the opportunity to deal with her being sick for days on end with explosive diarrhea, have you?
> A.    No.
> Q.    You haven't had the opportunity to figure out, well, what do I do if she's got to be at her tumbling class at 4:30 and I don't get off work until 4:00; correct?
> A.    Correct.
> Q.    Your activities with this child have, for the most part, been limited to what you can do at a McDonald's for two hours; correct?
> A.    Right.

positive for marihuana, unless the department has evidence that the parent's use of marihuana has caused significant impairment to the child's physical or mental health or emotional development.

TEX. FAM. CODE ANN. § 262.116(a)(8) (Supp.). It seems to me that when the Legislature said marihuana use alone is not grounds for the Department to take possession of a child, the Legislature trusted the courts to be able to put two-and-two together that marihuana use alone is not grounds for the Department to take the more drastic action of termination. But in this case, the briefing has raised the issue of "continuing danger," and that is my main focus.[8]

Father testified that he had stopped using methamphetamine.[9] That testimony was substantiated by *seven* tests from December 28, 2023, to March 28, 2024, which were admitted

---

[8]Father specifically raised Section 161.001(f) in his brief. In significant part, Father couched his argument in the "reasonable efforts to return" language of Section 161.001(f). *See* TEX. FAM. CODE ANN. § 161.001(f). However, Father raised "continuing danger" as part of his Section 161.001(f) argument. Father urges that "[t]he Department presented no evidence that Father's continued residence with fictive kin posed any danger to [Talia] . . . . The Department refused to conduct a home study solely because Father lived there—without offering alternatives or evidence that his presence endangered the child." The Department responded: "[Father] cites to no authority to support his apparent contention that the Department was required to address barriers to placement on behalf of him and his relatives, and the Department is aware of none." The Department cites Rule 38.1 of the Texas Rules of Appellate Procedure and thereby hints that we should find briefing waiver by Father. It does not seem appropriate to find briefing waiver by either party in a parental-rights termination case when, as is discussed herein (and as the Department obliquely concedes), there is no case addressing the meaning of "continuing danger" in Section 161.001(f). *See* TEX. FAM. CODE ANN. § 161.001(f). It bears noting that the Department's argument boils down to: "Who says we have to show that there is a danger to Talia in the Father's home?" Thus, from the briefs, I see the need to determine whether, via Section 161.001(f)'s "continuing danger" element, the Legislature has said, "We have, Department. That's who." *See* TEX. FAM. CODE ANN. § 161.001.

[9]His testimony was as follows:

> Q. (BY THE STATE:) Okay. Now, since this case began in November of 2023, you have continued to use illegal drugs; correct?
> A. There for a little bit after I got out, I did use marijuana a couple of times. I have been clean off of methamphetamines going on this month, last year, for a whole year.
> Q. Okay.
> A. No usage at all.
> . . . .
> Q. (BY FATHER'S COUNSEL:) Okay. So the last time you tested positive for meth was November of 2023; is that correct?
> A. Yes, ma'am.

25

into evidence.[10]  That was not the only substantiation.  There was, to be sure, a presumed positive for a missed test, in November 2024, but that was the only test he ever missed.  There were, however, other tests which the Department did not offer into evidence that were negative for methamphetamine, including multiple tests in the months between the lone presumed positive and the final hearing in May 2025.[11]  Robinson admitted as much.  When asked, "When is the last time, if you know, that [Father] tested positive for meth,"  Robinson responded, "For meth, it would have been back in November of 2023, I believe."  Consequently, Father's testimony regarding being off of drugs for "[a]bout a month and a half" was about marihuana, not methamphetamine.[12]

Which means that the Department's stated reason for refusing to conduct a home study, while couched in terms of being about positive "drug" tests, was actually about marihuana and

---

Q.      And according to the expert, all of the drug tests that were offered into evidence today, except for that November 2023, were positive for marijuana, marijuana metabolite; is that correct?

A.      Yes, ma'am.

[10]An appendix summarizing these test results as well as the test results of November 9, 2023, is attached to this dissent.

[11]These are discussed in Father's brief on pages 23–24 and were testified to by Robinson at volume two of the reporter's record, pages 81 through 82 and 136.

[12]His testimony was as follows:

Q.      (BY THE STATE:)  Are you drug-free now?
A.      Yes, sir.
Q.      How long have you been drug-free?
A.      I'm going on a couple of month[s].
Q.      Couple of months.  Okay.  This case has been going on for almost a year and a half; correct?
A.      Yes, sir.
Q.      All right.  And it is your testimony that you've been drug-free for a couple of months; correct?
A.      About a month and a half.

26

only marihuana. In other words, the Department sought marihuana-based *termination* despite testifying that it does *not* typically seek marihuana-based *removal*.[13] Save for father's marihuana use, this case comes close to the question left open by *In re R.R.A.*[14]

On the subject of "drugs," I acknowledge that *In re R.R.A.* held, in part, that "[t]he family service plan, which Father acknowledged at the outset, deemed a failure to test as a positive test. With this testing information in the record, a factfinder could infer that Father used drugs while his termination proceedings were pending." *In re R.R.A.*, 687 S.W.3d at 281. But there is more to *In re R.R.A.* than that.

The totality of the facts here differ dramatically from those in *In re R.R.A.* There, "Father used *felony-level* drugs as the primary caregiver of the children when there were no other relatives willing to care for them." *Id.* at 279 (emphasis added). Here, there is no evidence whatsoever that Father was using felony drugs at the time the Department was refusing the home study or the time of the final hearing. There, "Father had refused drug testing for nearly a year; had stopped visiting the children and had not inquired about their well-being." *Id.* at 281. Here, Father had shown up for drug testing with such consistency that the Department did not contend at trial that he was using methamphetamine. Here, Father showed up for visits with such regularity that his daughter was excited to see him. There,

---

[13]Galindo admitted as follows:

> Q. (BY THE STATE:) Ms. Galindo, does that Department still routinely remove children for marijuana use?
> A. Not marijuana use by itself.

[14]"Whether a parent whose drug use is ameliorated by completing court-ordered treatment could nonetheless have his or her rights terminated under (D) and (E) without any evidence of additional endangering conduct is not before us." *In re R.R.A.*, 687 S.W.3d at 280 n.55. Here, Father did so as to methamphetamine, but not marihuana.

27

[a]t or around that time [(first removal)], Father and the children were living in Father's car. Father's homelessness and employment difficulties [had] a close temporal relationship with his drug use, and a factfinder could reasonably infer Father's difficulties in providing shelter and support for his three very young children were related to his drug use.

*Id.* at 279. Here, the evidence was both that Father was using marihuana *and* that during the same time he remodeled a home to get it ready for his daughter.

The overall picture is what matters:

The court of appeals should not have ignored the *aggregate* weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial. The trial court reasonably could have inferred that this conduct, *in the aggregate*, endangered the children's physical and emotional well-being.

*Id.* at 281 (emphasis added).

Our review considers more than "drug" use:

While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial risk of harm. A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*Id.* at 278 (emphasis omitted) (quoting *In re J.O.A.*, 283 S.W.3d at 345).

Which brings me to the new requirement of "continuing danger."

When the Legislature enacted Section 161.001(f), the term "continuing danger" was already part of Texas law. But, in the prior law, the term "continuing danger" was accompanied by the term "a substantial risk of," and it was used in conjunction with a lower burden of proof applicable at an earlier stage of proceedings. From at least as far back as 2001 to the present,

28

Section 262.201(g)(3) of the Texas Family Code, and its predecessor, Section 262.201(b)(3), have provided that

> at the conclusion of the full adversary hearing, the court shall order the return of the child to the parent . . . unless the court finds *sufficient evidence to satisfy a person of ordinary prudence and caution* that . . . reasonable efforts have been made to enable the child to return home, but there is *a substantial risk of a continuing danger* if the child is returned home.

TEX. FAM. CODE ANN. § 262.201(g)(3) (emphasis added).[15]

By contrast, the "continuing danger" of Section 161.001(f) is expressly subject to the higher "clear and convincing" burden of proof, and the Legislature left out "a substantial risk of" as a preceding modifier:

> (f)     In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) *unless the court finds by clear and convincing evidence* and describes in writing with specificity in a separate section of the order that:
>
> > (1)     the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, *a continuing danger* remains in the home that prevents the return of the child to the parent.

TEX. FAM. CODE ANN. § 161.001(f)(1) (emphasis added).

---

[15]For predecessor statutes, *see* Act of May 30, 1999, 76th Leg., R.S., ch. 1390, § 39, 1999 Tex. Gen. Laws 4696, 4706, *amended by* Act of May 10, 2001, 77th Leg., R.S., ch. 306, § 1, 2001 Tex. Gen. Laws 577; Act of May 22, 2001, 77th Leg., R.S., ch. 849, § 4, 2001 Tex. Gen. Laws 1693, 1694; Act of May 29, 2005, 79th Leg., R.S., ch. 268, § 1.34(a), 2005 Tex. Gen. Laws 621, 633; Act of May 27, 2009, 81st Leg., R.S., ch. 856, § 2, 2009 Tex. Gen. Laws 2113; Act of May 20, 2013, 83d Leg., R.S., ch. 810, § 9, 2013 Tex. Gen. Laws 2026, 2029; Act of Mar.26, 2015, 84th Leg., R.S., ch. 1, § 1.163, 2015 Tex. Gen. Laws 1, 38; Act of May 12, 2015, 84th Leg., R.S., ch. 128, § 3, 2015 Tex. Gen. Laws 1132, 1133; Act of May 23, 2015, 84th Leg., R.S., ch. 338, § 4, 2015 Tex. Gen. Laws 1523, 1524; Act of May 26, 2015, 84th Leg., R.S., ch. 697, § 1, 2015 Tex. Gen. Laws 2173; Act of May 24, 2017, 85th Leg., R.S., ch. 317, § 20, 2017 Tex. Gen. Laws 612, 619; Act of May 28, 2017, 85th Leg., R.S., ch. 910, § 13, 2017 Tex. Gen. Laws 3706, 3709; Act of May 20, 2019, 86th Leg., R.S., ch. 375, § 2, 2019 Tex. Gen. Laws 679; Act of May 21, 2019, 86th Leg., R.S., ch. 467, § 7.004, 2019 Tex. Gen. Laws 909, 928; Act of May 22, 2019, 86th Leg., R.S., ch. 1294, § 7, 2019 Tex. Gen. Laws 3817, 3820; Act of Apr. 28, 2021, 87th Leg., R.S., ch. 8, §§ 7, 13(3), 2021 Tex. Gen. Laws 10, 13, 18; Act of May 23, 2021, 87th Leg., R.S., ch. 1047, § 7, 2021 Tex. Gen. Laws 2788, 2791.

Consequently, the "continuing danger" requirement of Section 161.001(f) has some real bite. The Legislature withheld from the courts the power to terminate ("may not order termination") unless this *new* "continuing danger" requirement is met. TEX. FAM. CODE ANN. § 161.001. It is a new requirement because "continuing danger" is now subject to a higher burden of proof, with a concomitant more stringent standard of appellate review.[16] It is also a new requirement because it is no longer "a substantial risk of continuing danger." TEX. FAM. CODE ANN. § 262.201(g)(3).

Now it is "continuing danger," period.

I come to this conclusion based on this principle of statutory construction: "'[E]very word of a statute must be presumed to have been used for a purpose. Likewise, we believe *every word excluded from a statute must also be presumed to have been excluded for a purpose*.'" *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) (emphasis added) (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)). "It follows, then, that '[w]hen the Legislature employs a term in one section of a statute and excludes it in another section, *the term should not be implied where excluded*.'" *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 260–61 (Tex. 2018) (alteration in original) (emphasis added) (quoting *Laidlaw Waste Sys.*, 904 S.W.2d at 659).

---

[16]*Id.*; *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, No. 24-0840, 2025 WL 3038976, at *3 (Tex. Oct. 31, 2025) ("Parents . . . benefit from an otherwise-inapplicable elevated standard of appellate review."); *In re C.C.*, 720 S.W.3d at 49–50 (Tex. App.—Texarkana 2025, no pet.).

But this is not a settled question. The Texas Supreme Court has not ruled on the meaning of "a substantial risk of continuing danger" at the removal and adversary hearing stage.[17] Nor has the Texas Supreme Court yet spoken to any aspect of Section 161.001(f), including "continuing danger" uncoupled from "a substantial risk of."

This leaves inferior courts with a problem of statutory construction regarding the interrelation of "continuing danger" and "endanger." "When the Legislature uses substantially the same words and phrases in a statute, subsequent uses of that same word in the same subject area ordinarily carry the same meaning." *In re R.R.A.*, 687 S.W.3d at 277. In 1987, the Texas Supreme Court considered the meaning of "endangers" as it appeared in a statutory termination ground of the time that would carry forward into the present as grounds (D) and (E). *Boyd*, 727 S.W.2d at 533; *In re R.R.A.*, 687 S.W.3d at 277 ("the Court interpreted 'endanger' for grounds (D) and (E) in *Boyd*.") The *Boyd* court rejected a lower court holding "that danger cannot be inferred from parental misconduct." *Id.* It appears then that, to some extent, danger can be inferred. *See id.* The court went on to hold that

> "endanger" means more than *a threat* of metaphysical injury or the *possible* ill effects of a less-than-ideal family environment, *it is not necessary* that the conduct be directed at the child or that the child *actually* suffers injury. Rather, "endanger" means to *expose* to loss or injury; to *jeopardize*.

---

[17]There is a Texas Supreme Court decision that has a lone mention of "substantial risk of continuing danger." *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). But that was in the context of determining the *factual* basis for *removal*, to assess whether a ground O *statutory* basis for *termination* had been satisfied. *Id.* at 242–43.

*Id.* (emphasis added) (citation omitted). In other words, some degree of risk is inherent in the word "danger." *See id.* This raises the question of *the degree* of jeopardy that would rise above that which is merely possible or metaphysical. *See id.*

In 2024 and again in 2025, the Texas Supreme Court revisited the meaning of "endanger" and summarized the holding of *Boyd* as involving the concept of "substantial risk." *In re R.R.A.*, 687 S.W.3d at 277 (citing *Boyd*, 727 S.W.3d at 534) ("A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being—the focus of grounds (D) and (E)—or to the child's health and safety—the focus of ground (P)."); *see In re N.L.S.*, 715 S.W.3d at 764 ("The proper inquiry is thus whether there is evidence that Father exhibited a pattern of behavior presenting a *substantial risk of* harm to N.L.S." (emphasis added)).

The conundrum is now apparent: in 2024 and 2025 the Texas Supreme Court expressed endangerment in terms of "substantial risk," but in the 2023 creation of Section 161.001(f), the Texas Legislature severed "substantial risk" from "continuing danger." However, by removing "substantial risk" from Section 161.001(f) in 2023, the Legislature was not contradicting the Texas Supreme Court, because the court did not express "endanger" in terms of "substantial risk" until 2024 and 2025. Likewise, the Texas Supreme Court did not speak to Section 161.001(f) in 2024 and 2025 because the petitions for removal in those cases had been filed before the effective date of Section 161.001(f). *See In re R.R.A.*, 687 S.W.3d at 272 (removal in 2020); *In re N.L.S.*, 715 S.W.3d at 762 (removal in 2021).

Therefore, inferior courts are not put to the choice of following the Texas Supreme Court or the Texas Legislature. There is a way to read Section 161.001(f) that gives effect to the intent of the Legislature while remaining faithful to the decisions of the Texas Supreme Court.

First, I believe that severing "a substantial risk of" from "continuing danger" in Section 161.001(f) expresses the Legislature's intent to distinguish the comparatively lower requirements placed on the Department by Section 262.201(g)(3) from the greater requirements of Section 161.001(f). The former is at an earlier stage of the proceedings, when the Department's investigation and attempts to return child to the parent are underway. The latter is at the final hearing, when the stakes are higher and the Department has had time to develop the case for termination, if such a case can be made.

Second, I believe that "danger" in Section 161.001(f) can remain consistent with the Texas Supreme Court's holding regarding the meaning of "endanger." But that is "danger," not "continuing danger." The Texas Supreme Court has not yet spoken to "continuing." I believe that "continuing" does some serious work. It serves to focus the inquiry on the here and now. By focusing the timeframe that can be considered, a byproduct of "continuing" is that it sharpens the focus on both the degree of harm and degree of risk being put forward as a justification for the civil death penalty, which is to say that while the same considerations regarding "danger" apply for the termination grounds of Sections 161.001(b)(1) and (f)(1), I believe that the Legislature meant to impose new requirements via Section 161.001(f)(1). If not, why did the Legislature bother? *See Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 55 (Tex. 2014)

33

("[W]e presume the Legislature does not impose meaningless requirements as part of its lawmaking function.").

The appellate cases ruling on Section 161.001(f) are very sparse, and as best I can tell, this Court is the first to squarely address the "continuing danger" requirement. There are a number of cases mentioning Section 161.001(f), but noting that the statute did not apply because the petitions for terminations in those cases were filed before the effective date.[18] There are a few cases discussing the degree of specificity in the trial court's order, without speaking to the meaning of "continuing danger" in Section 161.001(f).[19] Another case has spoken to "reasonable efforts at return."[20]

There is an appellate case which addressed Section 161.001(f) and included "continuing danger" in its holding. *See In re M.N.M.*, 708 S.W.3d at 332 ("Given the unique circumstances of this case, we conclude that the trial court could have formed a firm conviction or belief that the Department made reasonable efforts to return [the child] to [the mother and father], but a continuing danger prevented the child's return.").

---

[18]*See, e.g.*, *In re Z.K.L.*, No. 06-25-00003-CV, 2025 WL 1021490, at *3 (Tex. App.—Texarkana Apr. 7, 2025, no pet.) (mem. op.); *see also In re J.S.*, No. 11-25-00079-CV, 2025 WL 3095495, at *7 (Tex. App.—Eastland Nov. 6, 2025, no pet.) (mem. op.); *In re E.R.M.*, No. 05-25-00678-CV, 2025 WL 2898005, at *4 n.2 (Tex. App.—Dallas Oct. 10, 2025, no pet.) (mem. op.); *In re E.C.-L.H.-D.*, No. 07-24-00190-CV, 2024 WL 4692126, at *4 (Tex. App.—Amarillo Nov. 5, 2024, pets. denied) (mem. op.).; *In re Z.E.C.*, No. 08-23-00282-CV, 2024 WL 779616, at *9 (Tex. App.—El Paso Feb. 26, 2024, no pet.) (mem. op.); *In re J.S.*, 687 S.W.3d 541, 546 (Tex. App.—Eastland 2024, no pet.).

[19]*See, e.g.*, *In re M.B.*, No. 14-25-00418-CV, 2025 WL 3275376, at *7 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet.); *In re Y.K.*, 722 S.W.3d 273, 279–81 (Tex. App.—Fort Worth 2025, no pet.).

[20]*In re Z.K.*, No. 14-25-00231-CV, 2025 WL 2473254, at *8 (Tex. App.—Houston [14th Dist.] Aug. 28, 2025, pet. denied) (mem. op.).

That case, however, focused on "reasonable efforts at return" in a way that was not intertwined with "continuing danger." *Id.* at 330 ("Section 161.001(f) requires that the Department put forth reasonable efforts to return the child before trial, not between filing the original petition and trial."); *id.* at 327 ("Section 161.001(f): 'Reasonable Efforts to Return the Child'").

That case presents a conflict of outcome with this case. The "unique circumstances" of that case stand in stark contrast to the circumstances here: "Because [the father and mother] had no housing at the time, *they lived in [the paternal great-grandmother's] home with the child.*" *Id.* at 326 (emphasis added). In other words, *this is another example of the Department attempting something there that they refused to try here. See id.* The attempt in that case did not work out for many reasons. For one, the paternal great-grandmother "was the designated safety monitor charged with twenty-four-hour supervision of the child," but the "Department supervisor . . . witnessed [father and mother] with [the child] at the store without [the paternal great-grandmother] in violation of the safety plan." *Id.* What is more, the child tested positive for "marihuana metabolite" at a level "indicative of continued marihuana exposure." *Id.* Even then, the attempt continued: "[T]he Department did not seek removal until . . . after [father and mother] were arrested for theft." *Id.* at 326–27. The father and mother had the child with them when "they were caught shoplifting." *Id.* at 327. Both the father and mother were already on community supervision resulting from state jail felon(ies). *Id.* For each of them, community supervision was revoked, resulting in state jail confinement. *Id.* "[I]ncarceration rendered them physically unable to care for the child, and they had no home in which the child could reside

35

during their absence." *Id.* at 332. The great-grandmother was eliminated as an option "due to her repeated inability to supervise the child or keep her from ingesting marihuana prior to removal," and another family member was eliminated "based on her criminal history and previous involvement with the Department." *Id.*

**Conclusion**

The meaning of Section 161.001(f) matters. For this Father, what evidence can be used against him to show a Section 161.001(f) continuing danger and what weight should that evidence be given? I do not espouse any arbitrary temporal cutoff. The child's circumstances and the father's conduct, even when the child was in utero, would count in the balance. But to give effect to "continuing," what has happened before should be attenuated by what has happened since, and a greater emphasis should be placed on the circumstances at the time of the final hearing. At the time of the final hearing, Father and his daughter were bonded. Father had consistently shown up for visits with the child. The child was happy with her Father. Father, regrettably, was continuing to test positive for marihuana. But Father, to his credit, was making a concerted and successful effort to avoid using methamphetamine. On this score, I would consider the deemed positive test, but I would give greater weight, for purposes of the continuing danger review, to the consistency of actual tests showing no methamphetamine use and the lack of evidence of methamphetamine in the months before the final hearing.

Significantly, there is no testimony that Father himself exposed the child to marihuana. There was an early visit where Father brought a friend whom the Department's witness said smelled of marihuana. That friend never came back. The report of a marihuana odor regarding

36

the friend is significant, because it shows the Department's witness could smell it and would have reported it if Father had smelled marihuana during his visits. There is no such testimony in the record, which shows that while Father did not quit using marihuana outright, he was able to avoid using it when and before visiting his daughter.

Father had a home for his daughter, a home that the Department refused to consider. On these facts, I would reverse termination. Regardless of his past faults and his ongoing failings, I see a father who is trying.

"Because termination is always the last resort, it is to be hoped that the department can abandon a request for termination in many cases." *D.V.*, 2025 WL 3038976, at *5. I believe this is, or could have been, a case where a solution less drastic than termination could have been found. Father's appellate brief essentially asked, "In light of Section 161.001(f) where is the continuing danger in the home that prevented the return of this child?" The Department answered a question with a question: "Who says we have to show that?"[21]

I believe the Department's question deserves an answer. I believe that answer is: "The Texas Legislature, that's who."

Accordingly, I respectfully dissent.


Jeff Rambin
Justice

Date Submitted:     August 25, 2025
Date Decided:     December 12, 2025

---

[21]*See* discussion of the parties' briefs, *supra* note 8.

37

| Exhibit | Collection Date | Result |
|---|---|---|
| P-11 | November 9, 2023<br><br>Urine<br><br>(3 RR 1436)<br>(3 RR 1438)<br>(3 RR 1560)<br>(2 RR 63)<br>(Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET**<br><br>Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **112274438**, Specimen ID # **CC15332161**, with Accession number **F393670**. The following **148** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.<br><br>The specimen (**F393670**) screened positive for **Amphetamine / Methamphetamine and Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed **Positive** for **Methamphetamine and Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by creatinine, pH, and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a **Positive** result for **Methamphetamine and Marijuana Metabolite (THCA)** was reported.<br><br>Documentation Package Reviewed by:<br><br>*Kenneth Reine* / *[Signature]* / *Lab Manager* 08SEP2024<br>Printed Name · Signature · Title · Date<br><br>See table below. |

| Urine Substance Abuse Panel | | Initial Test Level | MS Confirm Test Level |
|---|---|---|---|
| AMPHETAMINE/METHAMPHETAMINE | | 1000 ng/mL | |
|   AMPHETAMINE | Negative | | 500 ng/mL |
|   METHAMPHETAMINE | POSITIVE | | 500 ng/mL |
| BARBITURATES | Negative | 300 ng/mL | 200 ng/mL |
| BENZODIAZEPINES | Negative | 300 ng/mL | 200 ng/mL |
| COCAINE METABOLITE (BZE) | Negative | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITE (THCA) | POSITIVE | 50 ng/mL | 15 ng/mL |
| METHADONE | Negative | 300 ng/mL | 200 ng/mL |
| MDMA/MDA | Negative | 500 ng/ml | 250 ng/ml |
| OPIATES | Negative | 300 ng/mL | 300 ng/mL |
| 6-ACETYLMORPHINE | Negative | 10 ng/mL | 10 ng/mL |
| OXYCODONE/OXYMORPHONE | Negative | 100 ng/mL | 100 ng/mL |
| PHENCYCLIDINE | Negative | 25 ng/mL | 25 ng/mL |
| PROPOXYPHENE | Negative | 300 ng/mL | 200 ng/mL |

| Urine Quantitative Results | |
|---|---|
| METHAMPHETAMINE | 1295 ng/mL |

| P-12 | November 9, 2023 Hair (3 RR 1586) (3 RR 1588) (3 RR 1720) (2 RR 64) (Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET** Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **112274438**, specimen ID# **CC15332162**, accession **F398265**. The following **156** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process. The specimen (**F398265**) screened positive for **Amphetamine and Methamphetamine** by LDTD-MS/MS and screened **Positive** for **Cannabinoids** by Enzyme Immunoassay. The specimen confirmed **Positive** for **Amphetamine and Methamphetamine** by Mass Spectrometry. The specimen quantity was not sufficient for complete analysis for **Marijuana Metabolite.** Following review of the analytical data and chain of custody documentation, a **Positive** result for **Amphetamine and Methamphetamine** was reported. NOTE: The indicated drug(s) have been reported POSITIVE/ABNORMAL according to laboratory policies. Specimen quantity was not sufficient for complete analysis for one or more additional drugs. AMPHETAMINE POSITIVE 500 pg/mg 500 pg/mg METHAMPHETAMINE POSITIVE 500 pg/mg 500 pg/mg Hair Quantitative Results AMPHETAMINE 1139 pg/mg METHAMPHETAMINE 16073 pg/mg |
|---|---|---|
| P-13 | December 28, 2023 Urine (3 RR 1744) (3 RR 1746) (3 RR 1820) (2 RR 64-65) (Dept. Br. 23-24) | Urine Substance Abuse Panel — Initial Test Level / MS Confirm Test Level: AMPHETAMINE/METHAMPHETAMINE Negative 1000 ng/mL 500 ng/mL; BARBITURATES Negative 300 ng/mL 200 ng/mL; BENZODIAZEPINES Negative 300 ng/mL 200 ng/mL; COCAINE METABOLITE (BZE) Negative 300 ng/mL 150 ng/mL; MARIJUANA METABOLITE (THCA) POSITIVE 50 ng/mL 15 ng/mL; METHADONE Negative 300 ng/mL 200 ng/mL; MDMA/MDA Negative 500 ng/ml 250 ng/ml; OPIATES Negative 300 ng/mL 300 ng/mL; 6-ACETYLMORPHINE Negative 10 ng/mL 10 ng/mL; OXYCODONE/OXYMORPHONE Negative 100 ng/mL 100 ng/mL; PHENCYCLIDINE Negative 25 ng/mL 25 ng/mL; PROPOXYPHENE Negative 300 ng/mL 200 ng/mL. Urine Quantitative Results MARIJUANA METABOLITE 89 ng/mL documentation, a **Positive** result for **Marijuana Metabolite (THCA)** was reported. |
| P-14 | January 11, 2024 Urine (3 RR 1846) (3 RR 1848) (3 RR 1946) (2 RR 65-66) (Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET** Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636**, Specimen ID# **4501840** with accession number **G286359**. The following **104** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process. The specimen (**G286359**) screened positive for **Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed positive for **Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by pH, creatinine and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite (THCA)** was reported. |

39

| | | |
|---|---|---|
| | | Urine Substance Abuse Panel, Initial Test Level, MS Confirm Test Level<br><br>AMPHETAMINE/METHAMPHETAMINE — Negative — 1000 ng/mL — 500 ng/mL<br>BARBITURATES — Negative — 300 ng/mL — 200 ng/mL<br>BENZODIAZEPINES — Negative — 300 ng/mL — 200 ng/mL<br>COCAINE METABOLITE (BZE) — Negative — 300 ng/mL — 150 ng/mL<br>MARIJUANA METABOLITE (THCA) — POSITIVE — 50 ng/mL — 15 ng/mL<br>METHADONE — Negative — 300 ng/mL — 200 ng/mL<br>MDMA/MDA — Negative — 500 ng/ml — 250 ng/ml<br>OPIATES — Negative — 300 ng/mL — 300 ng/mL<br>6-ACETYLMORPHINE — Negative — 10 ng/mL — 10 ng/mL<br>OXYCODONE/OXYMORPHONE — Negative — 100 ng/mL — 100 ng/mL<br>PHENCYCLIDINE — Negative — 25 ng/mL — 25 ng/mL<br>PROPOXYPHENE — Negative — 300 ng/mL — 200 ng/mL<br><br>Urine Quantitative Results<br><br>MARIJUANA METABOLITE — 116 ng/mL |
| P-15 | February 8, 2024<br><br>Hair<br><br>(3 RR 1952)<br>(3 RR 1954)<br>(3 RR 2052)<br>(2 RR 66)<br>(Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET**<br><br>Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636**, Specimen ID# **CC15332726** with accession **G718579**. The following **122** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.<br><br>The specimen (**G718579**) screened positive for **Cannabinoids** by Enzyme Immunoassay. The specimen confirmed **positive** for **Marijuana Metabolite** by Mass Spectrometry. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite** was reported.<br><br>Hair Substance Abuse Panel, Initial Test Level, MS Confirm Test Level<br><br>AMPHETAMINE — Negative — 500 pg/mg — 500 pg/mg<br>METHAMPHETAMINE — Negative — 500 pg/mg — 500 pg/mg<br>MDA — Negative — 500 pg/mg — 500 pg/mg<br>MDMA — Negative — 500 pg/mg — 500 pg/mg<br>BENZOYLECGONINE — Negative — 500 pg/mg — 500 pg/mg<br>COCAINE / METABOLITES — Negative — 500 pg/mg — 500 pg/mg<br>MARIJUANA METABOLITE — POSITIVE — 1.0 pg/mg — .1 pg/mg<br>OPIATES (MOR and/or HYM) — Negative — 200 pg/mg — 200 pg/mg<br>OPIATES (COD and/or HYC) — Negative — 200 pg/mg — 200 pg/mg<br>6-ACETYLMORPHINE (6-AM) — Negative — 200 pg/mg — 200 pg/mg<br>OXYCODONE — Negative — 200 pg/mg — 200 pg/mg<br>OXYMORPHONE — Negative — 200 pg/mg — 200 pg/mg<br>PHENCYCLIDINE (PCP) — Negative — 300 pg/mg — 300 pg/mg<br><br>Hair Quantitative Results<br><br>MARIJUANA METABOLITE — 1.2 pg/mg |

40

| P-16 | February 8, 2024<br><br>Urine<br><br>(3 RR 2076)<br>(3 RR 2078)<br>(3 RR 2151)<br>(2 RR 66-67)<br>(Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET**<br><br>Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636,** Specimen ID# **CC15332727** with accession number **G720041.** The following **98** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.<br><br>The specimen (G720041) screened positive for **Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed positive for **Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by pH, creatinine and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite (THCA)** was reported.<br><br>Urine Substance Abuse Panel |
|------|------|------|

Urine Substance Abuse Panel

|  | | Initial Test Level | MS Confirm Test Level |
|--|--|--|--|
| AMPHETAMINE/METHAMPHETAMINE | Negative | 1000 ng/mL | 500 ng/mL |
| BARBITURATES | Negative | 300 ng/mL | 200 ng/mL |
| BENZODIAZEPINES | Negative | 300 ng/mL | 200 ng/mL |
| COCAINE METABOLITE (BZE) | Negative | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITE (THCA) | POSITIVE | 50 ng/mL | 15 ng/mL |
| METHADONE | Negative | 300 ng/mL | 200 ng/mL |
| MDMA/MDA | Negative | 500 ng/ml | 250 ng/ml |
| OPIATES | Negative | 300 ng/mL | 300 ng/mL |
| 6-ACETYLMORPHINE | Negative | 10 ng/mL | 10 ng/mL |
| OXYCODONE/OXYMORPHONE | Negative | 100 ng/mL | 100 ng/mL |
| PHENCYCLIDINE | Negative | 25 ng/mL | 25 ng/mL |
| PROPOXYPHENE | Negative | 300 ng/mL | 200 ng/mL |

Urine Quantitative Results

| MARIJUANA METABOLITE | 63 ng/mL |
|--|--|

| P-17 | February 22, 2024<br><br>Urine<br><br>(3 RR 2176)<br>(3 RR 2178)<br>(3 RR 2254)<br>(2 RR 67-68)<br>(Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET**<br><br>Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636,** Specimen ID# **CC15332760** with accession number **G937161.** The following **102** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.<br><br>The specimen **(G937161)** screened positive for **Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed positive for **Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by pH, creatinine and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite (THCA)** was reported. |
|------|------|------|

| | | |
|---|---|---|
| | | Urine Substance Abuse Panel |

Initial Test Level / MS Confirm Test Level

| | | Initial Test Level | MS Confirm Test Level |
|---|---|---|---|
| AMPHETAMINE/METHAMPHETAMINE | Negative | 1000 ng/mL | 500 ng/mL |
| BARBITURATES | Negative | 300 ng/mL | 200 ng/mL |
| BENZODIAZEPINES | Negative | 300 ng/mL | 200 ng/mL |
| COCAINE METABOLITE (BZE) | Negative | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITE (THCA) | POSITIVE | 50 ng/mL | 15 ng/mL |
| METHADONE | Negative | 300 ng/mL | 200 ng/mL |
| MDMA/MDA | Negative | 500 ng/ml | 250 ng/ml |
| OPIATES | Negative | 300 ng/mL | 300 ng/mL |
| 6-ACETYLMORPHINE | Negative | 10 ng/mL | 10 ng/mL |
| OXYCODONE/OXYMORPHONE | Negative | 100 ng/mL | 100 ng/mL |
| PHENCYCLIDINE | Negative | 25 ng/mL | 25 ng/mL |
| PROPOXYPHENE | Negative | 300 ng/mL | 200 ng/mL |

Urine Quantitative Results

MARIJUANA METABOLITE    41 ng/mL

| | |
|---|---|
| **P-18** | **March 7, 2024**<br><br>**Urine**<br><br>(3 RR 2280)<br>(3 RR 2282)<br>(3 RR 2357)<br>(2 RR 68-69)<br>(Dept. Br. 23-24) |

**DOCUMENTATION PACKAGE COVER SHEET**

Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636**, Specimen ID# **CC15332814** with accession number **H160830**. The following **100** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.

The specimen (**H160830**) screened positive for **Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed positive for **Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by pH, creatinine and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite (THCA)** was reported.

Documentation Package Reviewed by:

**Kenneth Reine**

| Printed Name | Signature | Title | Date |
|---|---|---|---|
| | | Lab Manager | SEP 2 1 2024 |

Urine Substance Abuse Panel

| | | Initial Test Level | MS Confirm Test Level |
|---|---|---|---|
| AMPHETAMINE/METHAMPHETAMINE | Negative | 1000 ng/mL | 500 ng/mL |
| BARBITURATES | Negative | 300 ng/mL | 200 ng/mL |
| BENZODIAZEPINES | Negative | 300 ng/mL | 200 ng/mL |
| COCAINE METABOLITE (BZE) | Negative | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITE (THCA) | POSITIVE | 50 ng/mL | 15 ng/mL |
| METHADONE | Negative | 300 ng/mL | 200 ng/mL |
| MDMA/MDA | Negative | 500 ng/ml | 250 ng/ml |
| OPIATES | Negative | 300 ng/mL | 300 ng/mL |
| 6-ACETYLMORPHINE | Negative | 10 ng/mL | 10 ng/mL |
| OXYCODONE/OXYMORPHONE | Negative | 100 ng/mL | 100 ng/mL |
| PHENCYCLIDINE | Negative | 25 ng/mL | 25 ng/mL |
| PROPOXYPHENE | Negative | 300 ng/mL | 200 ng/mL |

Urine Quantitative Results

MARIJUANA METABOLITE    >1500 ng/mL

| P-19 | March 28, 2024 | |
|---|---|---|
| | Urine | |
| | (3 RR 2382) (3 RR 2384) (3 RR 2458) (2 RR-69) (Dept. Br. 23-24) | **DOCUMENTATION PACKAGE COVER SHEET**

Attached is a summary and copies of laboratory documents related to the analysis of Donor ID # **24324636**, Specimen ID# **CC15332814** with accession number **H160830**. The following **100** pages are true and accurate copies of the original documents that were generated during the normal course of business by Quest Diagnostics Incorporated. The original documents were generated at or near the time of each process.

The specimen (**H160830**) screened positive for **Marijuana Metabolite (THCA)** by enzyme immunoassay and confirmed positive for **Marijuana Metabolite (THCA)** by Mass Spectrometry. The validity of the specimen was assessed by pH, creatinine and general oxidant testing and was determined to be acceptable. Following review of the analytical data and chain of custody documentation, a positive result for **Marijuana Metabolite (THCA)** was reported.

Documentation Package Reviewed by:

Kenneth Reine _____ Lab Manager SEP 2 1 2024
Printed Name   Signature   Title   Date

| | Urine Substance Abuse Panel | | Initial Test Level | MS Confirm Test Level |
|---|---|---|---|---|
| AMPHETAMINE/METHAMPHETAMINE | Negative | | 1000 ng/mL | 500 ng/mL |
| BARBITURATES | Negative | | 300 ng/mL | 200 ng/mL |
| BENZODIAZEPINES | Negative | | 300 ng/mL | 200 ng/mL |
| COCAINE METABOLITE (BZE) | Negative | | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITE (THCA) | | POSITIVE | 50 ng/mL | 15 ng/mL |
| METHADONE | Negative | | 300 ng/mL | 200 ng/mL |
| MDMA/MDA | Negative | | 500 ng/ml | 250 ng/ml |
| OPIATES | Negative | | 300 ng/mL | 300 ng/mL |
| 6-ACETYLMORPHINE | Negative | | 10 ng/mL | 10 ng/mL |
| OXYCODONE/OXYMORPHONE | Negative | | 100 ng/mL | 100 ng/mL |
| PHENCYCLIDINE | Negative | | 25 ng/mL | 25 ng/mL |
| PROPOXYPHENE | Negative | | 300 ng/mL | 200 ng/mL |

Urine Quantitative Results

MARIJUANA METABOLITE     706 ng/mL |

43